OGDEN-FAIRMOUNT, INC., Plaintiff-Appellee, v. THE ILLINOIS RAC-
ING BOARD, Defendant-Appellant.

Fifth District   No. 5—85—0422

Opinion filed October 3, 1986.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones
Stewart, Solicitor General, and Kathryn A. Spalding, Assistant Attorney
General, of Chicago, of counsel), for appellant.

J. William Lucco, of Mudge, Riley, Lucco & Brown, of Edwardsville,
and Samuel K. Skinner and Jeffrey R. Tone, both of Sidley & Austin, of
Chicago, for appellee.

JUSTICE JONES delivered the opinion of the court:

The Illinois Racing Board (Board) appeals an order of the circuit
court entered upon administrative review that vacated an order of the
Board that had imposed certain sanctions and a penalty upon a race-
track licensee, Ogden-Fairmount, Inc. (Fairmount), the operator of
Fairmount Park, a racetrack located at Collinsville. The court's order
remanded the cause to the Board for a new hearing, and we granted

the Board's petition for leave to appeal filed pursuant to Supreme Court Rule 306(a)(i) (103 Ill. 2d R. 306(a)(i)). At issue is whether the Board had and properly exercised the authority to impose the sanctions and penalty.

The case concerns the authority of the Board to administer the Race Track Improvement Fund (RTIF). That fund was established by the legislature in section 32 of the Illinois Horse Racing Act of 1975 (Ill. Rev. Stat., 1975 Supp., ch. 8, par. 37—32). The purpose of the RTIF, as set forth in subsection (d) of section 32, is to enable the Board to make payments to racetracks "for the cost of erection, improving or acquisition of seating stands, buildings or other structures, ground or track, or for the payment of the cost of amortization of debt contracted with the approval of the Board for any or all such purposes." The source of the funds for the RTIF is the "breakage" that derives from the conduct of pari-mutuel wagering at race meets conducted at the tracks. "Breakage" is defined by section 3.02 of the Horse Racing Act of 1975 (Ill. Rev. Stat., 1975 Supp., ch. 8, par. 37—3.02) as "the odd cents by which the amount payable on each dollar wagered exceeds a multiple of 10¢." The term "breakage" is explained in the 1983 Illinois Racing Board Annual Report as follows:

"Race track wagers are paid in multiples of 10¢. If, for example, the odds reflect that each winning dollar wager is worth $3.19, the patron receives only $3.10. The nine cents are defined as breakage. One half of the breakage is revenue to the state and the other half is deposited in the account of the organization licensee which operates the race track where the wager is placed. The odd cents on the dollar accumulate rapidly and over $4 million is distributed annually for capital improvement at all Illinois race tracks from the Race Track Improvement Fund. (Illinois Racing Board Annual Reports, 1980, 1981, 1982, 1983)."

Pursuant to section 32(b), 50% of the breakage from each race meet, except for charity racing meets, is to be collected by the State Department of Revenue and deposited with the State Treasurer in an account maintained for each organization licensee. Pursuant to other provisions of the Act, the other 50% of the breakage become State funds. Section 32 also contains directions to the Board to keep accurate records of the amounts deposited in each account and to promulgate rules and regulations concerning the information required, deadlines for filing, and the types of application forms to be used by tracks seeking moneys from the fund.

Acting pursuant to section 32(e) of the Act, the Board promulgated forms and procedures for licensees to withdraw money from the RTIF.

The rules adopted provided that a licensee submit two forms. One would be an application that would be a description of the project and request for approval. The prescribed form required the licensee to certify that the information included with the application was true and correct. The Board would use this form and its contents to perform its function of determining whether the proposed project comes within the purview of the statute creating the fund. After the project was approved and completed, the licensee would submit the second of the forms prescribed, a request for payment from the fund. This latter form was to include the contractor's statement of services performed and the amount to be paid with evidence of payment by the licensee. Upon order of the Board, the State Treasurer would reimburse the licensee from moneys in the RTIF credited to the particular licensee.

At a meeting of the Board held on September 6, 1979, the Board adopted a "sense of the Board" resolution. Because of its importance to the decision in this case, we will set out in full the action of the Board in adopting the resolution:

"AGENDA ITEM II(b)

Ms. Gordon reads Agenda Item II(b): 'Request submitted by Chicago Downs Association, Inc. for Race Track Improvement Fund (RTIF) Application for Disbursement #80-002 for the installation of new sewers, lighting, planters, and pavement in the west parking lot.'

Ms. Gordon questioned Mr. Johnston on particulars of the project, and as to whether competitive bids had been obtained. A discussion ensued among the Board members as to the propriety of requiring competitive bids in Applications for Disbursement to the Race Track Improvement Fund. Mr. Garrison moved that it be the sense of the Board that an association accompany an Application for Disbursement with three competitive bids. *He made clear that this is not an amendment of the rules, only a sense of the Board.* Mr. Kellman seconded the motion. A call of the roll was taken, and the motion was approved by a vote of 7-0. Mr. Ciambrone moved, and Mr. Ward seconded, that the request submitted by Chicago Downs Association be approved." (Emphasis added.)

Neither the statute creating the RTIF nor the rules adopted by the Board to implement the statute require a licensee to submit competitive bids from contractors for proposed work either with the application for project approval or the request for payment. The sole authority for the requirement that three competitive bids be submitted with an application was the "sense of the Board" resolution.

Between 1976 and 1984 Fairmount submitted 43 applications for improvement-project reimbursement from the RTIF. In June 1984 the Board learned that 19 of these applications had been submitted with two of the required three bids for each application being spurious. The Board requested Fairmount to conduct an internal investigation of the matter. That was done, and the spurious bids revealed. The investigation disclosed that spurious submissions were used in a practice followed by three successive managers/employees of Fairmount. These managers apparently would negotiate an arms length, or legitimate, contract for improvements with Hayden, a contractor favored by them for his prompt and satisfactory performance of work. Hayden would then obtain bids higher than his own for the same work from other contractors or companies controlled by himself, other members of his family or his friends. These other bids were prepared by Hayden, were spurious and were submitted by Fairmount's managers or employees, along with Hayden's legitimate bid, with the full knowledge that they were spurious. The Board, under the impression that all the bids were legitimate, approved all 19 of Fairmount's applications and authorized total payments of $2,101,570.06 for these applications.

On November 2, 1984, counsel for the Board filed a petition to show cause why certain orders of the Illinois Racing Board should not be vacated and why civil penalties should not be imposed. The petition recited the foregoing facts in specific detail in two counts. Count I concluded with a prayer that Fairmount show cause why the order of the Board approving the applications and payment for the 19 projects should not be vacated and why Fairmount should not be directed to return the $2,101,570.06 to the RTIF. Count II of the petition concluded with a request for issuance of a rule against Fairmount requiring it to show cause why civil penalties not to exceed $470,000 should not be imposed against it for the "submission of 47 false documents to the Board."

Hearing on the petition for a rule to show cause was conducted by the Board on November 13, 1984. The Board and Fairmount entered into a stipulation of facts that we have summarized; Fairmount agreeing that each of the 19 applications for improvement projects and reimbursement were accompanied by two spurious bids and that Fairmount had received $2,101,570.06 as a result of those applications. Fairmount produced evidence to show that the improvements that were the subject of the 19 applications in question were legitimate, as shown by the fact that the Board had approved them. Expert testimony was utilized to establish the fact that the bids from Hayden had been reasonable ones and had yielded "fair value received" for the amounts of the vari-

ous bids. There was also evidence to show that the bids from Hayden could reasonably have been higher than they actually were because the value of the improvements to Fairmount actually exceeded their cost. It was also developed that there were no kickbacks or payments of any nature made to the managers of Fairmount that had utilized the spurious bids. Finally, Fairmount was able to show that none of the officers or employees of the corporate owner of Fairmount, Ogden Leisure, Inc., had any knowledge whatsoever of the use of the spurious bids by Fairmount's managers and employees and that they had cooperated fully in the investigation of the matter. This effort included the retention of a private law firm to make a full and detailed investigation and report, all of which had been furnished to the Board. This investigation had yielded full details as to what had occurred and the manner of misconduct that spawned the spurious bids. Finally, it was shown that the managers of Fairmount that had utilized the spurious bids were no longer employed by Fairmount or any of its affiliated companies and that measures had been taken to assure that similar acts would not occur in the future.

The Board rendered its decision in a comprehensive order filed on December 18, 1984. As to count I the Board found that officers and employees of Fairmount knowingly supplied the Board with 19 applications for RTIF funds that contained representations of fact they knew to be false and that the Board relied on those false representations and approved reimbursement to Fairmount in the amount of $2,101,570.06. The Board found that sanctions were warranted, and it thereupon vacated the several orders that brought about the payments and directed Fairmount to return $2,101,570.06 to its account in the RTIF where it was to remain until such time as new applications were received and approved by the Board. As to count II the Board made further findings of fact, especially concerning the proof of "fair value received" made by Fairmount. As to such evidence the order recited that "[w]e consider the issue of fair value, as raised in this case by [Fairmount], to be something of a red herring." It was further found that although the managers and employees of Fairmount had received some gifts of an inconsequential nature from Hayden, they had not been motivated by a desire for personal gain in their dealings with Hayden. "Thus," the order recited, "we are forced to apply traditional legal principles of corporate responsibility and liability and to conclude that their actions were by and on behalf of the corporation." Civil penalties totaling $105,000 were then imposed for each of the 19 applications.

Upon administrative review in the circuit court, the order of the Board was vacated. The court found that although the 19 applications

in question were accompanied by false certifications as to the bids submitted, the information contained in the body of the applications themselves was nevertheless true. The court further found that the Board had exceeded its authority under the Horse Racing Act of 1975 by creating a remedy of rescission and requiring complete reimbursement. Rather than rescind, the court held, the Board should have determined the amount of the actual monetary damages to the fund according to damage principles applicable in civil actions in a court of law. As to the civil penalties totaling $105,000, the court found that the Board erred in assessing those penalties without taking into account the mitigating evidence Fairmount had to offer. The cause was remanded to the Board with directions to conduct a hearing to determine, by the application of the traditional principles of contract law, whether the amount reimbursed from the fund was greater than the value received by Fairmount for the 19 projects. With regard to the civil penalties imposed, the remandment was for the purpose of hearing and considering any evidence in mitigation presented by Fairmount. As stated, the Board petitioned for, and we granted, leave to appeal.

It is our perception of the trial court's order that it essentially adopted and applied a law-of-contracts approach to its resolution of the issues of the case, extending even to the remedy it utilized. The Board understandably takes sharp issue with that approach because, the Board contends, it altogether ignores the paramount purpose behind the adoption of the Horse Racing Act of 1975 by the legislature. That purpose is the preservation of honesty and integrity in the horse racing industry. The Board argues that the order of the trial court discounts completely the express and implied powers conferred upon it by the Act to assure that the honesty and integrity of horse racing is maintained. It is that purpose, and those powers, that enabled the Board lawfully to impose the sanction of voiding the orders for reimbursement and assessing the civil penalties. Citing *Phillips v. Graham* (1981), 86 Ill. 2d 274, 427 N.E.2d 550, and *Feliciano v. Illinois Racing Board* (1982), 110 Ill. App. 3d 997, 443 N.E.2d 261, the Board points out that Illinois courts have granted recognition to the compelling State interest in the honesty and integrity of horse racing. In order to gain approval for withdrawing RTIF moneys, a proposed project must meet two criteria, the Board says. First, the project must be within the purview of the fund as provided by section 32(d) of the Act. Second, the application must comply with the procedure established by Board rules, and part of that procedure, according to the rules adopted, consists of a certification that the contents of the application are true and correct. When a licensee engages in conduct injurious to the sport and

the public welfare by flagrantly disregarding the requirements of honesty and integrity of the Act by filing false certifications with the Board, the Board has authority to withdraw its approval of the applications and to demand return of the moneys thus expended. It was not the violation of the "sense of the Board" resolution itself that prompted the Board's action but Fairmount's dishonest actions in lying on the certifications. As to the civil fines, the Board contends that they are expressly authorized by section 9(l) of the Act and must therefore stand.

Reduced to its essence, the Board's position throughout these proceedings has been, and remains, that serious damage has been done to the honesty and integrity of horse racing and to the authority of the Board to perform its duties. At the same time the Board concedes, as it must, that the Act is silent with regard to any express authorization to vacate orders for reimbursement of licensees for improvements pursuant to RTIF procedures. Because of the primacy of the policy to preserve the honesty and integrity of horse racing, such powers of the Board are to be inferred from other powers expressly conferred by the Act. As noted by the supreme court in *Eastman Kodak Co. v. Fair Employment Practices Com.* (1981), 86 Ill. 2d 60, 70, 426 N.E.2d 877, 881-82:

> "While an agency may not issue regulations which exceed or alter its statutory power (*Ruby Chevrolet, Inc. v. Department of Revenue* (1955), 6 Ill. 2d 147, 151) or which are contrary to the legislative purpose and intent of the statute (*People ex rel. Illinois Highway Transportation Co. v. Biggs* (1949), 402 Ill. 401, 409), an administrative agency has authority to regulate and execute the provisions of the statute and to carry out the powers conferred upon it."

It is this principle of administrative law that the Board relies upon as the authority to vacate its orders for reimbursement from the RTIF.

Fairmount's position continues to be that the Board lacked statutory authority to order the return of the funds and that the "sense of the Board" resolution is not binding on it because it was not adopted in the manner required by the Illinois Administrative Procedure Act (Ill. Rev. Stat. 1983, ch. 127, par. 1001 *et seq.*). Therefore, since bids are not required, the Board cannot withdraw its approval where at least one legitimate bid was submitted with each application. Fairmount also contends that it should not be required to return the reimbursement money to the RTIF because it received fair value for the projects completed despite the fact that spurious bids accompanied the applications.

■ The Board's contention is unassailable that the purpose under-

lying the Horse Racing Act of 1975 and the duties assigned to it by that Act are to establish, maintain, and preserve honesty and integrity in the horse racing industry. Fairmount readily concedes the point. Nor may quarrel be had with the proposition advanced by the Board that an administrative agency has implied powers to carry into effect its statutory function. However, where the authority of an administrative body is in question, the determination of the scope of its power and authority is a judicial function, not a question to be finally determined by the administrative agency itself. *Social Security Board v. Nierotko* (1945) 327 U.S. 358, 90 L. Ed. 718, 66 S. Ct. 637; *Wayne State University v. Cleland* (E. D. Mich. 1977), 440 F. Supp. 806; *Chemetco, Inc. v. Pollution Control Board* (1986), 140 Ill. App. 3d 283, 488 N.E.2d 639; *People ex rel. Thompson v. Property Tax Appeal Board* (1974), 22 Ill. App. 3d 316, 317 N.E.2d 121.

Rather than inquiring into the authority of the Board to vacate its orders for reimbursement, our disposition of this case centers upon the Board's utilization of its "sense of the Board" resolution as the ultimate basis for its finding of deception practiced by Fairmount's employees.

Although there is no discussion of the particular matter, it seems to be without question that, if the Board had chosen to do so, it could have made the requirement that three competitive bids accompany applications by licensees for RTIF reimbursement a part of its rules. That point may be established by reference to the Administrative Procedure Act (Ill. Rev. Stat. 1983, ch. 127, par. 1001 *et seq.*). One of Fairmount's principal arguments is, and we agree, that the "sense of the Board" resolution was not binding upon it as a rule because it was not promulgated as required by the Administrative Procedure Act. Not only was that Act not followed, the "sense of the Board" resolution expressly provided that it *was not* to be a rule.

We confess to some difficulty in fixing the true nature of and the effect to be given to the "sense of the Board" resolution. The Board has not cited us to any authority for the use of such a medium for the exercise of agency powers. Had the informally adopted resolution been made a rule of the Board, its purpose and effect would have been made clear. However, for reasons that do not appear, the subject of the resolution was expressly not made a rule. That fact, together with the highly irregular and informal manner in which the resolution was adopted, leaves grave questions regarding its effect. We have set forth above the entirety of the minutes of the portion of the Board meeting at which the resolution was adopted. The occasion was the Board's consideration of agenda item II(b). Agenda item II(b) was concerned with

an application by a licensee other than Fairmount for RTIF moneys. The minutes reflect that a Board member asked whether competitive bids had been obtained. They also show that the Board then held a discussion as to the propriety of requiring competitive bids in applications for RTIF moneys. Board member Garrison then moved "that it be the sense of the Board that any association [licensee?] accompany an Application for Disbursement with three competitive bids. He made clear that this is not an amendment to the rules, only a sense of the Board." The motion was seconded and unanimously adopted. Agenda item II(b) concluded with the approval of the application for funds submitted by the particular licensee involved. It never did appear whether that particular licensee had submitted three, or any, competitive bids.

Thus, while pursuing a rather informal adjudicating procedure (deciding on an application for money from the RTIF), the Board adopted a "rule"—although expressly declaring it not to be a rule—that was definitely legislative in character and effect, an effect that ostensibly went well beyond the decision on the application then being considered. The intended purport and effect is not at all clear. If the "sense of the Board" resolution is not a rule, then what is it? It is at this point that research fails us. The initial reaction is that the Board obviously intended to circumvent both the statute and the rules. Perhaps only a *stare decisis* effect was intended, but that is not readily apparent since the record is silent as to the submission of three bids in the petition under consideration at the time. Or, conceivably, by this resolution the Board was merely advising licensees as to the manner in which it would exercise its discretion in deciding petitions filed for RTIF moneys. It is to be noted, we think, that the "sense of the Board" resolution was never published beyond its inclusion in the minutes.

■ As stated, as far as we can determine the "sense of the Board" resolution is without precedent. It has no basis in either the statutes or the rules pertaining to the Board or to horse racing. We can only pronounce the obvious: the resolution is vague and uncertain as to purpose and binding effect. It can be deemed to constitute no more than the current advice of the Board to licensees as to the best way to proceed in making improvements with money from the RTIF. As promulgated, the resolution is not legally binding on anyone. The Board itself could change it at will, whether with the same or a different membership composition. The Board also could choose to ignore the resolution if it chose to do so. This was conceded by the assistant Attorney General in argument of the case on administrative review before the circuit court, as follows:

"And as was brought out, there aren't always three competi-

tive bids. Perhaps other evidence is brought in, or perhaps there is a review done of the facilities by the Board members in specific cases that they do go past just what is on the paper and question the bids. Or where there aren't three bids, they go past whatever the bid is to say, well, why are you only taking one? What has been your dealings with this one industry, this one corporation that leads you to believe it is fair, so that we can justify the spending of this money?

There were other methods that could have been done, that dealt with dealing with the Board on a one-to-one level, and reviewing what the bid, if it was a single bid, or more than one bid, was."

Aside from the fact that the guidelines contained in the "sense of the Board" resolution were not followed, there is no wrongdoing shown to have occurred. There was no fraud upon the Board in the traditional sense because there was no monetary damage. The money involved in the RTIF was at all times the property of Fairmount, to be paid out upon order of the Board. The projects of improvement involved in the 19 applications in question were all legitimate, as evidenced by the fact that the Board approved all of them. No kickbacks or illegal payments were made to those responsible for submitting the spurious bids. The one true bid submitted with the applications was a legitimate, negotiated bid, and the construction work resulted in full value received for the money. All of this the Board concedes to be true, or, at least, no evidence to the contrary was offered.

We remain aware that the position of the Board has remained throughout that it does not matter that the effectiveness of its "sense of the Board" resolution is questionable or that full value was received for the reimbursement made from the RTIF; the offense was the making of the false certifications that the spurious bids were genuine and in that manner deceiving the Board. Such deception is the gravamen of the wrongdoing that called for the voiding of the reimbursement orders and the assessment of the civil penalties. The real damage, the Board insists, was not to the RTIF, but to the honesty and integrity of racing and to the authority of the Board to preserve it.

We think that the Board oversimplifies the situation by concentrating its thinking upon what it asserts was a false and deceptive certification. The Board overlooks the fact that it was the Board's own distortion of the proper exercise of administrative authority that led to what it regards as defalcations by Fairmount's employees. The "sense of the Board" resolution was, at best, an arbitrary exercise of administrative powers. Simply put, government should not, and cannot, be conducted

in such a manner, especially where severe penalties are imposed as a result of the exercise of power in such an arbitrary manner. The "sense of the Board" resolution must fail as a directive, and all consequences that flow from a failure to follow it also must fail. The requirement for three bids could properly be disregarded, and any required certification as to authenticity should also be disregarded. In the case of each of the 19 applications in question, one bid was legitimate, the projects described in the applications were legitimate, the certification as to each legitimate bid was concededly true, and no person, agency or institution suffered any monetary damage as a result.

Since the Board has built its case against Fairmount upon its own distorted exercise of administrative authority, the voiding of the orders for reimbursement of Fairmount from the RTIF and the imposition of the civil penalties were improper. If it be thought that this result constitutes a blow to the integrity and honesty of racing, and we think it does not, then it is the Board itself that helped strike it.

Section 9(l) of the Horse Racing Act of 1975 authorizes the Board to impose civil penalties of up to $5,000 against individuals and up to $10,000 against organizations for "each violation of any provision of this Act, any rules adopted by the Board, any order of the Board or any other action which, in the Board's discretion, is a detriment or impediment to horse racing." Because of the manner of the Board's attempted exercise of its powers, as above discussed, section 9(l) of the Act cannot serve to confer discretion on the Board to impose the civil penalties totaling $105,000 or any other amount.

That portion of the order of the trial court that vacated the order of the Board directing Fairmount to reimburse the RTIF in the amount of $2,101,570.06, as well as that portion of the trial court's order that vacated the order of the Board assessing civil penalties in the amount of $105,000, is affirmed. That portion of the trial court's order that remanded the case to the Board for further hearing is reversed.

Affirmed in part and reversed in part.

WELCH and HARRISON, JJ., concur.