(No. 64327.—

(No. 64918.—

OGDEN-FAIRMOUNT, INC., Appellee, v. THE ILLI-
NOIS RACING BOARD, Appellant.—JAMES R.
HAYDEN, Appellee, v. THE ILLINOIS RACING
BOARD *et al.*, Appellants.

*Opinion filed December 21, 1987.—Rehearing
denied February 2, 1988.*

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Kathryn A. Spalding, Assistant Attorney General, of Chicago, of counsel), for appellant Illinois Racing Board.

J. William Lucco, of Mudge, Riley, Lucco & Brown, of Edwardsville, and Samuel K. Skinner, Jeffrey R. Tone and Frank B. Vanker, of Sidley & Austin, of Chicago, for appellee.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Patricia Rosen, Assistant Attorney General, of Chicago, of counsel), for appellant Illinois Racing Board.

Rice Law Offices and Law Offices of A.J. Nester (A.J. Nester, of counsel) (Philip R. Rice, of counsel), of Belleville, for appellee.

JUSTICE SIMON delivered the opinion of the court:

In the first of these two consolidated cases, cause No. 64327, the Illinois Racing Board (the Board) ordered Ogden-Fairmount, Inc. (Ogden-Fairmount), to return $2.1 million to the Race Track Improvement Fund (the Fund) and to pay a penalty of $105,000 for submitting false documents to the Board. Ogden-Fairmount sought judicial review of the order in the circuit court of Madison County, and that court vacated both the reimbursement order and the penalty and remanded the case for further proceedings before the Board. The circuit court ruled that the Board could only order payment of any actual monetary damages suffered by the Fund, not return of the $2.1 million, and that in assessing any penalty the Board must allow Ogden-Fairmount to present mitigating evidence. The appellate court affirmed the vacation of the reimbursement order and the penalty but vacated the remand to the Board, holding that both the reimbursement order and the penalty were improper. (147 Ill. App. 3d 789.) We allowed the Board's petition for leave to appeal (107 Ill. 2d R. 315(a)).

In the second consolidated case, cause No. 64918, the Board excluded James R. Hayden from all racetracks under the jurisdiction of the Board for 15 months for preparing false documents that were submitted to the Board by Ogden-Fairmount. Hayden sought judicial re-

view of the Board's order in the circuit court of Madison County. The circuit court reversed the Board's order because it found that the findings and order of the Board were contrary to the manifest weight of the evidence and contrary to law. The appellate court affirmed (151 Ill. App. 3d 1167) by an unpublished order (107 Ill. 2d R. 23), and we allowed the Board's petition for leave to appeal (107 Ill. 2d R. 315(a)).

Since these cases arise out of the same set of facts, they have been consolidated for appeal. The Board now concedes that it had no authority to order Ogden-Fairmount to return $2.1 million to the Fund, and it is not appealing that portion of the decision. The only issue remaining in cause No. 64327 is whether the Board had the authority to fine Ogden-Fairmount $105,000. In cause No. 64918 the issue is whether it had the authority to exclude Hayden from Illinois racetracks for 15 months.

Ogden-Fairmount operates Fairmount Park, a racetrack in Collinsville, Illinois. It is an organization licensee within the meaning of section 3.11 of the Illinois Horse Racing Act of 1975 (the Horse Racing Act) (Ill. Rev. Stat. 1985, ch. 8, par. 37—3.11). Hayden was granted a license by the Board in 1984 as the owner of thoroughbred horses. He is also the president and owner of Hayden Construction Company in Belleville, Illinois. The Board, which is an appellant in both cases, is an administrative agency vested with the authority to enforce the provisions of the Horse Racing Act. The Southern Illinois Trotters Association, Inc. (SITA), an appellant in cause No. 64918, is an Illinois corporation with jurisdiction over horse racing tracks in southern Illinois, including Fairmount Park.

One of the Board's duties is administration of the Race Track Improvement Fund. (Ill. Rev. Stat. 1985, ch. 8, par. 37—32.) The Board is mandated to use the Fund

"to aid tracks in improving their facilities" (Ill. Rev. Stat. 1985, ch. 8, par. 37—32(c)), and money from the Fund may be distributed for the cost of erecting, acquiring or improving seating stands, buildings or other structures, for purchasing or restoring equipment and for the payment of the cost of amortization of debt. (Ill. Rev. Stat. 1985, ch. 8, par. 37—32(d).) Each organization licensee is required to deposit one-half of the total breakage from all noncharitable racing meetings with the State Treasurer in an account established for that organization licensee. (Ill. Rev. Stat. 1985, ch. 8, pars. 37—28(g), 37—32(b).) "Breakage" is defined as "the odd cents by which the amount payable on each dollar wagered exceeds a multiple of 10." (Ill. Rev. Stat. 1985, ch. 8, par. 37—3.02.) The Illinois Racing Board Annual Report explains "breakage" and the basic operation of the Fund as follows:

> "Race track wagers are paid in multiples of 10. If, for example, the odds reflect that each winning dollar wager is worth $3.19, the patron receives only $3.10. The nine cents are defined as breakage. One half of the breakage is revenue to the state and the other half is deposited in an account of the organization licensee which operates the race track where the wager is placed. The odd cents on the dollar accumulate rapidly and over $4 million is distributed annually for capital improvement at all Illinois race tracks from the Race Track Improvement Fund." Illinois Racing Board Annual Reports, 1980, 1981, 1982, 1983.

Section 32(e) of the Horse Racing Act states that the Board "shall promulgate procedural rules and regulations governing information required, deadlines for filing, and types of application forms to be observed by the tracks seeking monies from the Fund." (Ill. Rev. Stat. 1985, ch. 8, par. 37—32(e).) The regulations enacted by the Board pursuant to section 32(e) require the licensee to submit two forms when seeking money from the Fund

for a project. The first form is the application, in which the organization licensee describes a project and seeks Board approval for it. (See 11 Ill. Adm. Code 404.10(b) (1986).) Part of the prescribed form is a certification by the submitting officers or employees of the organization licensee that the information in the application is true and correct. The Board uses the application to determine whether a proposed project comes within the purview of the statute creating the Fund. The second form is a request for payment, which is submitted after the project is approved and completed. The request must include the contractor's statement of services furnished, the amount to be paid to the licensee and evidence of payment to the contractor. (11 Ill. Adm. Code 404.20 (1986).) Upon order of the Board, the State Treasurer may then reimburse the licensee from the balance in the Fund credited to that licensee.

On September 6, 1979, the Board met and adopted a "sense of the board Resolution" that any organization licensee must provide at least three competitive bids with each application seeking approval of expenditures from the Fund.

From 1980 to 1984, Ogden-Fairmount submitted 19 applications for project approval that purported to contain three competitive bids. Each of the applications contained a notarized certification that all of the information contained in the application was true and correct. The information was not true and correct, however, because two of the bids in each application were spurious ones; they were not legitimate attempts to procure the contract. Instead of obtaining three legitimate bids for each project, Robert Graham, an officer of Ogden-Fairmount and the general manager of Fairmount Park, and his two successors, John Weaver and Roger Smith, negotiated contracts with Hayden to complete the projects. Hayden then obtained spurious bids that were in

amounts higher than his own; these bids were from contractors or companies which he or members of his family or his friends controlled. Ogden-Fairmount submitted these bids to the Board in its application with full knowledge that they were rigged. The Board, believing that all the bids were legitimate, approved all 19 applications and authorized total payments of $2,101,570.06 for these projects.

In June 1984, the Board learned that these 19 applications contained spurious bids and requested that Ogden-Fairmount conduct an internal investigation. The investigation revealed that the bids were not legitimate ones.

Cause No. 64327 was initiated on November 2, 1984, when counsel for the Board served Ogden-Fairmount with a "Petition for a Rule to Show Cause Why Certain Orders of the Illinois Racing Board Should Not Be Vacated and Why Civil Penalties Should Not Be Imposed." Count I of the petition sought vacation of the Board orders approving payment for the 19 projects and requested that Ogden-Fairmount be required to return to the Fund the $2,101,570.06 it had received as reimbursement for these projects. Count II petitioned the Board to impose a $470,000 fine for submission by Ogden-Fairmount of 47 false documents.

A hearing on this petition was held on November 13, 1984. Ogden-Fairmount stipulated that each of the 19 applications contained a notarized certification by Ogden-Fairmount that the information in the application was true and correct. Ogden-Fairmount admitted that each of the 19 applications contained two spurious bids and that it had received $2,101,570.06 as a result of those applications. It presented evidence that the bids from Hayden were reasonable and that Fairmount Park received "fair value" for the work performed on the projects in question.

The Board's written order was issued on December 18, 1984. As to count I, the Board found that officers and employees of Ogden-Fairmount supplied the Board with 19 applications which they knew contained false information and that the Board relied on those false representations when it approved the $2,101,570.06 reimbursement to Ogden-Fairmount. Therefore the Board vacated its 19 reimbursement orders and directed Ogden-Fairmount to return the $2,101,570.06 to its account in the Fund until new applications and requests for payment were submitted and approved by the Board. As to count II, the Board rejected both the Board counsel's request to impose penalties for each of the false documents submitted and Ogden-Fairmount's argument that the submission of false documents was one continuous course of conduct for which only one penalty should be imposed. Instead, the Board decided that each of the 19 applications was a separate violation. The Board also stated that the evidence regarding the fair value of Hayden's work was a "red herring" because it was not relevant to the charge that false and misleading documents were knowingly submitted to the Board. Pursuant to section 9(l) of the Horse Racing Act, which authorizes the Board to impose civil penalties of up to $10,000 against organizations for each violation of the Horse Racing Act, the Board's rules or orders or any other action which, in the Board's discretion, is a detriment or impediment to horse racing (Ill. Rev. Stat. 1985, ch. 8, par. 37—9(l)), the Board penalized Ogden-Fairmount $20,000 for submitting false information on the two projects costing over $500,000 ($10,000 per project) and $5,000 each for the other 17 projects, for a total fine of $105,000.

The circuit court, in vacating the Board's order, stated that the Board should have applied traditional principles of contract law to determine whether any ac-

tual money damages were suffered by the Fund as a result of the Board's approval of the 19 projects. The court said that if the Board wanted to pursue this issue, it should conduct a hearing with respect to what money damages were suffered by the Fund. The court also vacated the imposition of the $105,000 fine and remanded the issue of civil penalties, ordering the Board to conduct a hearing on this issue and to allow Ogden-Fairmount to present mitigating evidence.

The appellate court focused on the propriety of the "sense of the Board" resolution. The court agreed with Ogden-Fairmount's argument that the three-bid resolution was not a binding rule because it was not promulgated pursuant to the procedure directed by the Illinois Administrative Procedure Act. (147 Ill. App. 3d 789, 796.) The court stated that the resolution was adopted in a highly irregular and informal manner and was vague and uncertain as to its purpose and binding effect. (147 Ill. App. 3d at 796-97.) Rejecting the Board's argument that the effectiveness of the sense of the Board resolution was irrelevant because the offense was the submission of the false certifications that the spurious bids were genuine for the purpose of deceiving the Board, the court stated:

> "The Board overlooks the fact that it was the Board's own distortion of the proper exercise of administrative authority that led to what it regards as defalcations by Fairmount's employees. *** The 'sense of the Board' resolution must fail as a directive, and all consequences that flow from a failure to follow it also must fail. The requirement for three bids could properly be disregarded, and any required certification as to authenticity should also be disregarded." (147 Ill. App. 3d at 798-99.)

The court also held that because the Board exceeded its authority in promulgating the three-bid resolution, it did not have the authority under section 9(l) of the Horse

Racing Act to impose the $105,000 in civil penalties for the submission of false information. Therefore the appellate court affirmed the portion of the trial court order that vacated the Board's order requiring Ogden-Fairmount to return the $2,101,570.06 and to pay $105,000 in penalties and reversed the portion of the trial court's order that remanded the case to the Board.

Although the three-bid resolution was not a properly promulgated rule because the Board, in adopting the resolution, overlooked the procedures mandated by the Illinois Administrative Procedure Act (Ill. Rev. Stat. 1985, ch. 127, par. 1001 *et seq.*), that fact is irrelevant to the issue of the Board's authority to penalize Ogden-Fairmount. The basis of the imposition of the civil penalties was Ogden-Fairmount's knowing submission of false documents to the Board in a deliberate attempt to deceive the Board. Ogden-Fairmount also falsely certified that all the information in the applications was true and correct. Ogden-Fairmount was, of course, free to challenge the three-bid resolution in a judicial proceeding or to refuse to comply with it because it was not a binding rule. Instead, over a period of four years, Ogden-Fairmount chose to gather spurious bids, submit them to the Board, and deliberately lie in its applications by including a notarized certification that all the information in the applications was true and correct.

Section 9(l) vests the Board with the power to impose civil penalties for any action which, in the Board's discretion, is a detriment or impediment to horse racing. As this court has previously recognized, "the horse-racing industry depends upon public confidence in the sport and upon integrity and professional efficiency in its operation." (*Phillips v. Graham* (1981), 86 Ill. 2d 274, 286.) It is properly within the Board's discretion to determine that knowingly submitting false documents to the Board (even though their submission may not be legally re-

quired) and certifying that they are true is a threat to the integrity of horse racing and therefore detrimental to the sport. We therefore conclude that the Board had the authority to penalize Ogden-Fairmount $105,000.

The appellate court confused the Board's authority to require three bids with its authority to require that all information set forth in an application submitted to the Board be true and correct. The court stated, "The requirement for three bids could properly be disregarded, and any required certification as to authenticity should also be disregarded." (147 Ill. App. 3d 789, 799.) The fact, however, that the Board did not properly promulgate the three-bid rule did not taint its authority to require that all information submitted in an application be true and correct. Notwithstanding the Board's lack of authority to enforce the three-bid resolution because of its failure to follow the procedures in the Administrative Procedure Act, it had the authority, under section 32(e) of the Horse Racing Act, to require that a licensee certify that all information in an application is true and correct. Section 32(e) gives the Board the authority to promulgate rules governing the information required from and the types of application forms to be used by licensees seeking money from the Fund. (Ill. Rev. Stat. 1985, ch. 8, par. 37—32(e).) The application form developed by the Board pursuant to this section requires that the applicant certify that all information in the application is true and correct. This requirement could not be properly disregarded, and the Board has the authority to penalize licensees who disregard it.

Ogden-Fairmount argues that the Board abused its discretion by penalizing it because the purpose of its deception was to evade the three-bid requirement and the only consequence of its action was to lead the Board to believe that Ogden-Fairmount had complied with an invalid requirement. It emphasizes that each of the 19 pro-

jects was properly reimbursable and that Hayden charged a fair price. These considerations and the other "mitigating evidence" as to fair value offered by Ogden-Fairmount, however, are irrelevant to the fact that the licensee deliberately submitted false documents to the Board, conduct which the Board has the authority to penalize.

Ogden-Fairmount also argues that the penalty was not necessary to preserve the integrity of horse racing. It first notes that its employees' conduct was not for pecuniary gain and that the appellate court found that there was no fraud on the Board "in the traditional sense" because there was no monetary damage. (147 Ill. App. 3d 789, 798.) The absence of monetary advantage to Ogden-Fairmount does not, however, change the fact that it deliberately deceived the Board. Second, Ogden-Fairmount argues that its response to the conduct of its employees reflected its commitment to the integrity of racing. It points out that it no longer employs the people who submitted the false documents and that it cooperated with the Board by conducting an internal investigation of the improper practices. These subsequent efforts, while mitigating considerations, do not, however, erase Ogden-Fairmount's deception in purposefully submitting spurious bids and false certifications to the Board over a period of four years.

Equally unconvincing is Ogden-Fairmount's suggestion that it has already been sufficiently punished because it has paid for legal representation, expert witnesses and an extensive audit. A wrongdoer should not escape punishment simply because it has found it necessary to spend money defending itself.

In an attempt to shift the blame for its conduct to the Board, Ogden-Fairmount argues that we should not countenance the improper promulgation of a rule by the Board and then penalize conduct that never would have

occurred in the absence of the improperly adopted rule. As previously noted, however, nothing in the promulgation of the rule required Ogden-Fairmount to lie to the Board; it could have chosen to disregard the three-bid resolution or to challenge it in court. In an analogous case, the perjury conviction of a Chicago police officer was upheld where he argued that he testified untruthfully because a police department rule prohibited officers from refusing to give evidence before a grand jury, a rule that was subsequently declared unconstitutional. (*United States v. Nickels* (7th Cir. 1974), 502 F.2d 1173, 1175.) The court held that even in the face of this unconstitutional rule, the officer was not privileged to lie to the grand jury. (502 F.2d at 1175-76.) We find no reason why this court should employ lesser ethical standards than those applied by Federal courts, particularly where, as here, the rule in question has not been challenged as unconstitutional. (See also *United States v. Pacente* (7th Cir. 1974), 503 F.2d 543, 548-49 (*en banc*); *United States ex rel. Annunzato v. Deegan* (2d Cir. 1971), 440 F.2d 304, 306.) Just as the police officer could not use the unconstitutional rule as an excuse for his perjury to the grand jury, Ogden-Fairmount should not be permitted to rely upon the improper promulgation of the three-bid resolution as an excuse for its submission of false documents to the Board.

The Board properly exercised its authority to penalize Ogden-Fairmount for its deliberately deceptive conduct. The portions of the appellate court decision and the circuit court order in cause No. 64327 relating to the return of the $2.1 million to the Fund are affirmed since, as noted above, it is not contested by the Board in this appeal, but the portion of the appellate court decision vacating the $105,000 penalty is reversed, as is the circuit court order vacating the penalty and remanding the case for further proceedings before the Board.

Cause No. 64918 began on November 10, 1984, when SITA stewards at Fairmount Park, pursuant to their authority under section 9(e) of the Horse Racing Act, issued an order excluding Hayden from all Illinois horse racing tracks because he prepared the spurious bids which Ogden-Fairmount then submitted to the Board. Hayden appealed this ruling to the Board, and on March 23, 1985, the Board, after a hearing, entered an order affirming the stewards' decision. Pursuant to section 9(e) of the Horse Racing Act, the Board excluded Hayden from all racetracks under the jurisdiction of the Illinois Racing Board for 15 months.

Hayden filed a complaint for administrative review, and on October 23, 1985, the circuit court reversed the Board's order. The court prohibited the Board from excluding Hayden from Illinois horse racing tracks. The Board appealed the order to the Illinois Appellate Court, which affirmed the decision in an unpublished Rule 23 order. The Board argued that both the three-bid resolution and section 9(e) authorized it to punish Hayden. The court decided that Hayden could not be properly excluded under the three-bid rule because that rule was improperly promulgated and therefore invalid. The court also determined that there was no basis on which the Board could have properly concluded that Hayden's exclusion was warranted pursuant to section 9(e). Its view was that Hayden gave the false bids to Ogden-Fairmount, not to the Board, and that he was no more than an "unwitting accomplice to Fairmount Park's scheme to obtain reimbursement." *Hayden v. Illinois Racing Board* (1987), 151 Ill. App. 3d 1167, slip op. at 7 (unpublished Rule 23 order).

Although we agree with the appellate court that the Board could not properly exclude Hayden under the three-bid resolution, we believe that Hayden was prop-

erly excluded pursuant to the Board's authority under section 9(e) of the Horse Racing Act. It provides:

> "The Board, and any person or persons to whom it delegates this power, may eject or exclude from any race meeting or organization grounds or any part thereof, any occupation licensee \*\*\* whose conduct. or reputation is such that his presence on organization grounds may, in the opinion of the Board, call into question the honesty and integrity of horse racing \*\*\*. The power to eject or exclude occupation licensees may be exercised for just cause by the organization licensee or the Board, subject to subsequent hearing by the Board as to the propriety of said exclusion." Ill. Rev. Stat. 1985, ch. 8, par. 37—9(e).

We have already emphasized the importance of maintaining integrity in horse racing, and a review of section 9(e) and the other provisions of the Horse Racing Act "discloses the legislature's interest in imposing strict controls on an industry which on occasion has been vulnerable to dishonest men and practices." (*Phillips v. Graham* (1981), 86 Ill. 2d 274, 286.) It is reasonable for the Board to determine that the preparation by a horse owner of spurious bids for submission to the Board over a period of four years is conduct which reflects adversely on the character of the owner and may threaten the integrity of horse racing; the suspension was therefore proper. One who willingly instigates, gathers and prepares at least 18 spurious bids over a period of four years can hardly be called an "unwitting accomplice."

Hayden argues that the Board may only penalize licensees who "fix" or "rig" races and that his conduct had no effect on the integrity of the sport of horse racing. Section 9(e), however, does not limit the penalty of exclusion to those who "fix" races; nor does it require that the improper conduct be specifically related to the races themselves. Conduct not directly related to the races, such as preparation of spurious bids for submis-

sion to the Board, may also threaten the integrity of the horse racing industry, for it reflects on the integrity of those who seek to participate in racing as owners.

A suspension of 15 months was not, as Hayden argues, an excessive penalty. The Board did not abuse its discretion in determining that this was a serious offense which merited a rather lengthy suspension.

For the foregoing reasons, the judgments of the circuit court and appellate court in cause No. 64327 are affirmed in part and reversed in part, and the judgments of the circuit court and appellate court in cause No. 64918 are reversed, and the order of the Illinois Racing Board is affirmed.

*Cause No. 64327 — judgments affirmed in part*
*and reversed in part;*
*Cause No. 64918 — judgments reversed.*